Case number 21-5862, Charles Michael v. Bobbi Jo Butts. Oral argument, 15 minutes per side. Appellant. Good morning. All right, thank you very much, Chief Judge Sutton, and may it please the Court. Matthew Higgins for Petitioner Charles Michael. Threats to either fully confess or be permanently separated from your children are rare and always indefensible, but the threats that Michael endured here were extraordinary. Michael's children were taken from him and his wife, and 11 days later, the very same police officer and very same social worker responsible for that seizure threatened that Michael would never see his children again unless he fully confessed. That threat was explicit and off-the-charts credible, and Michael confessed to the worst of his interrogator's accusations just two and a half minutes after receiving those child separation threats, after denying those same accusations for the first 99 minutes. The Supreme Court's decision in Linum squarely and obviously applies. You say squarely and obviously applies. I mean, there, there were financial cutoffs. There was no Miranda warning. I'm not sure it squarely applies. I agree it has some support. Well, if I could take that in two parts. The financial threats here, if you look, what the Supreme Court has said about an involuntary confession, that is a subjective test, and reading Linum, we know that subjectively the suspect in that case was very concerned about the child. In fact, she said, the only reason I confessed is because of the child separation threats. That was what was driving my confession, and the Supreme Court held that that is the sort of threat that gives rise to an involuntary confession under the Fifth Amendment. If I may, I can go right into the Miranda warnings, if Your Honor would like. I mean, as you know, it's AEDPA and it's Supreme Court holdings, and you rely on Linum and then lower court cases, and I'm just, I'm just not sure. You started by saying it squarely controls, and I guess I'm not so sure about that. Well, of course, in Hill v. Hathpower, this Court has said that, you know, we look to lower court decisions to determine the scope of the federal right at issue, and Linum, you know, the right that Linum establishes, the right. The Supreme Court has pretty much told us not to do that, right, on multiple occasions. I mean, we're basically, we're not supposed to look at lower court cases. I think they've made that pretty clear. I mean, I don't know. It's pretty difficult. I mean, I suppose it's neither here nor there, but I mean, Linum really has to be the law that's not being, that was unreasonably applied, right? I mean, that has to be the case. Yes, Linum is the case that's unreasonably applied, but what AEDPA says is you look to whether or not the right was clearly established, and you look to Supreme Court case law for whether or not that right has been established, and Linum does establish that right, but then you can look to lower court cases to see how that right has been applied to determine whether or not the Kentucky Supreme Court's application of that right and application of that case law was reasonable. I do think the, I mean, this all gets to our D1 argument, our legal argument about whether or not the Kentucky Supreme Court was reasonable in its application of Linum, but if I may, I'd like to start with an explanation for why Michael is entitled to D2 relief for the state court's unreasonable factual determination. The state court determined as a factual matter that Michael did not respond at all to any of Robey and Newton's child separation threats, that he remained silent following each one, and respectfully, the record cannot be read that way, and that error alone is sufficient to grant Michael's petition. I mean, the record here shows that two and a half minutes after Social Worker Newton's first child separation threat, Michael made an extremely damning admission, different in kind from anything he admitted to before those child separation threats. His response time would have been even shorter if Robey hadn't kept interrupting him. But Mr. Higgins, after the coercive statement by the Social Worker, there were two other statements. Detective Robby says, it's your choice, and then Social Worker says they fondle each other all the time in the bathtub. It's not normal. She's not going to lie what she has seen you do. She can't make it up. She's five years old. I mean, that's the question, the interrogation that he actually responds to, and is it unreasonable for, why is it unreasonable for the Kentucky Supreme Court to say the response that he made, the full confession, was not in response to the coercive statement you rely upon, but instead the statement that the children fondle each other? Yeah, a couple things on that, Judge Griffin. First, Roby's statement that it's your choice, that what Roby was saying was it's your choice to either fully confess or never see your children again. And to answer your question about Newton's comment about the kind of abnormal sexual behavior and acting out, that was, you know, this is, those were comments that Roby and Newton had tried before at 298, at 301, at 312, and they didn't work before in the interrogation. It appears they worked here, and that's kind of a, well, that is a factual determination, whether they worked or whether the prior coercive statement is what worked. And I mean, our job is not to determine whether the factual determinations by the Kentucky courts are correct, but rather whether they're unreasonable. And it's hard for me to say it's unreasonable when there is a second statement that's in between the confession and the alleged coercive statement. That's all. Yes, Your Honor, but the only thing that changed between Michael's previous denials, I think the important point here is that before the child separation threat was issued by Newton that you pointed to, Michael denied the exact accusations repeatedly, consistently, before the child separation threat and before the statement about the fondling. So I assume Kentucky, the Kentucky Supreme Court knew that as well. And, you know, they made a call. They made a factual. And respectfully, our position is that that factual call was unreasonable, that the only reasonable inference that can be drawn, taking Michael's previous denials, previous expressed denials, coupled with the idea that he responded within two and a half minutes of this child separation threat, was that that threat was in response to, or excuse me, that those admissions were in response to the child separation threats that the, that wasn't. Let me ask you this, though. The other thing that Kentucky Supreme Court says, I think it's in that same paragraph, is, you know, that he had admitted to some inappropriate contact before any of the coercive statements were even made. And that factors into kind of the inducement part and the timing of the of the responses. I mean, what's your response to that point by the Kentucky Supreme Court? I think two things, Your Honor. First is that when this case was before the Kentucky Supreme Court, Michael was challenging all of the statements, all the incriminations, both before and after the explicit child separation threats. So our view is that with the Kentucky Supreme Court, when it was referring to these three instances that, in the court's view, amounted to instances of sexual abuse, what it was doing was saying that the statements that Michael made before the child separation threats are also admissible, wasn't necessarily bearing on its analysis for why the child separation threats were or were not admissible. Those statements it admitted or said were admissible and voluntary. In its view, the key thing it said was that there was that those statements were not made in response to any of the child separation threats. But that isn't it. I mean, it's an inducement question, right? I mean, the question is whether, I mean, I understand there's a historical fact question about whether he responded immediately or not, I suppose. It seems maybe that's not even a fact question, honestly. But we're really looking at inducement, right? So there's coercive statements. I'm not sure how coercive, but they're coercive. The Kentucky Supreme Court says they're coercive. And then he makes some admissions. But in examining whether the admissions were induced by the coercive statements, don't we look at whether there were other admissions that were made before the coercive statements? I mean, that suggests to me that they didn't really induce. He was willing to talk with or without the coercive statements. Yes, maybe the coercive statements pushed him along, but he had already shown a willingness to kind of admit conduct that was criminal, right? Well, I think two things on that, Your Honor. One, Haines v. Washington and Gallegos v. Colorado, two Supreme Court cases, have said that the admissions that happened before coercion are entitled to little, if any weight, when determining whether or not admissions that happened after coercion were in fact voluntary. But I'd say that those pre-coercion admissions that Your Honor's referring to are particularly unhelpful here, because pre-coercion, Michael denied everything that could potentially give rise to a sodomy charge. He denied everything that was of the kind of the more serious criminal conduct. And after the child separation threats, he admitted to those facts that give rise to the sodomy charge, the much more serious criminal conduct, immediately, within two and a half minutes, and at the first realistic opportunity that he had. What should we make of Linum being pre-Miranda? Yeah, so again, I mean, although Linum was pre-Miranda, the purpose of the Miranda rights is to inform the suspect that he has the right to remain silent. Which cuts the complete opposite way of coercion, right? I mean, for every threat, but you don't have to say anything. Right, right. But the same officers who administered the first warning, at least, said 90 minutes later that if Michael did not speak, he would never see his children again. I mean, in our view, that zaps the Miranda warning of its mitigating effect. That's the duty case in the Ninth Circuit, which was decided on habeas, and where the threats against invoking the Miranda rights were not nearly as serious as the threats that Roe v. Newton made here. And that's other cases we cite at 51 and 52 of our brief. I see my time is done. If there are no further questions, I'll reserve the rest for rebuttal. All right. Thank you, Mr. Kilgore. Good morning, and may it please the court. My name is Harrison Kilgore, and I represent the appellee, Warden Bobby Joe Budds. I think it's here on Mr. Michael's federal habeas petition, and it's highly deferential, excuse me, highly deferential standards apply. And I think that there are three general principles that pose an insurmountable obstacle to Mr. Michael's relief here. First, when the Supreme Court establishes a rule at a high level of generality, such as the totality of the circumstances test applicable here, state Supreme Courts have significant leeway in applying that test, and this court's review must be deferential. Second, the Kentucky Supreme Court's decision here must be measured against the clearly established holdings of the U.S. Supreme Court, not dicta, not decisions of circuit courts, not decisions of state appellate courts, and not the decision this court might reach on direct review. And finally, it would be inappropriate to grant habeas relief on an extension of the U.S. Supreme Court holding, even if that extension is the next logical step of the Supreme Court's reasoning. If there are no questions, I'd like to start at this point, I'd like to start with Mr. Michael's factual contention, his D2 argument about whether or not the coercive statements by the interrogators are what induced Mr. Michael's confession. Mr. Michael primarily relies on this two and a half minute gap between the third coercive statement made by interrogators and his later admission that his stepdaughter might have kissed his penis. But as Judge Griffin points out, in that interim, in that two and a half minute gap, there's another comment by the social worker that Mr. Michael's daughters are exhibiting behavior suggestive of abuse, that they're fondling each other and misbehaving and acting out in a way that is suggestive of abuse. And I would refer the court back to page ID number 298 to 299. This is the first instance in the interrogators use the same tactic in which they discuss the girls fondling each other. And immediately following this first use of the tactic at the bottom of page 298 to page 299 is when Mr. Michael makes his first admission to touching his stepfather. And so you have a situation in which the same interrogation tactic that worked the first time worked the second time. And again, because we're here under AEDPA, the factual- I'm sorry, you're talking about before the coercive statements on 298 and 298. Those are the statements that are before the responses to the coercive statements? Correct. So at page 298 to 299, there had not yet been any coercive statements. But that is the first time that the investigators bring up the children misbehaving in the bathtub and acting out. And it's following that exchange that Mr. Michael first admits that he's sexually abused his stepdaughter. Then you fast forward to 99 minutes into the interrogation and you have a situation, as Judge Griffin points out, where there is a statement that was found to be coerced by the Supreme Court of Kentucky, followed immediately by the exact same tactic that induced his first confession. And so Mr. Michael has to prove by clear and convincing evidence that it's not the second statement by Ms. Newton that ultimately induced his confession, but instead the coercive statement that was made before. But again, if we're relying on temporal proximity, the most proximate statement by investigators to Mr. Michael's later extension of his confession is the same tactic that worked in the beginning. And so under AEDPA, that presumptively correct factual determination by the Supreme Court of Kentucky must stand absent clear and convincing evidence to rebut it. And I think in a situation in which not only is the factual determination presumed to be correct, I guess I'm a little bit, I mean, I don't know. The factual determination, like I said before, is kind of seems like it's neither here nor there. I mean, it's, I don't even know what the fact, what is the historical fact determination that it was made, that the incriminating statements were made immediately or not in response. I mean, is that a fact question or is that just kind of a legal, I mean, a lot of this test seems like it's a legal determination, not a fact determination. I mean, we have the transcript. I mean, the incriminating statements are made after the coercive statements. They may not be made within 10 seconds. They're made a minute later or two minutes or whatever it is. I mean, all of that seems to me just factors into whether it was right. I do think that's fair. I think to the extent that there is a factual question, it's whether or not Mr. Michael's responses are direct response. But I do agree that that is wrapped up in this larger totality question about the circumstances around his confession. And I guess it's right that the question in any coerced confession case is whether or not the defendant's will has been overborne. And so I suppose that does ultimately go to an inducement question as well. Isn't that a factual issue, whether his confession is voluntary or not? I mean, that sounds like a quintessential factual issue for the trier fact under the totality of circumstance. Hard for me to see that that's an issue of law. I think I would respond this way in that I do. Mr. Michael pointed out that this is a subjective question as to what ultimately induced. But I think that it has to be based on objective factors that can be assessed as part of the totality. Well, you know, the way the interrogation was conducted and the way he responds to it. I mean, we do have the tape. We have the audio tape of this whole incident that I've listened to. And it sounds a lot worse, sounds a lot more coercive on the transcript than it does hearing it. I mean, the social worker, Newton, although she says these words, she's she's doing it very softly. And I think she's doing it in a very non-coercive manner, delivering coercive language. And then you can you can see that Mr. Michael is thinking about it. I mean, he is reflective on this. That's one reason there's two and a half minutes because he's he's taking it all in. He's not responding immediately to the coercive statements, but he's he's contemplating it. And you can you can actually kind of feel that he's he's he's calm. He's clear. He's reflective. And I think, you know, that's that's all factual. I mean, to say that, well, here we got the black and white transcript. Well, how is it delivered? How is it responded to? I mean, that that's really what a trier effect it's going to look like. Is it what's credible under this circumstance? I mean, you kind of agree with me the way it was presented here, that the manner that was presented was the social worker was very. I want to help you kind of. And even though, you know, you've got to tell us the truth, but if you want to get help and I mean, she's she's very effective. You can't agree with me. Is important as to the voluntariness. I do. I do agree, Judge Griffin. And we have not contested whether or not these statements are coercive, because that was a finding by the Supreme Court of Kentucky. And we do live with that. But I do think that it's fair in assessing the totality of the circumstances like you've done to go back and listen to the tape. And there is very much a rhythm to how this interrogation proceeds. He comes in initially. He's unwilling to admit to Michael when he returns later in the day. He admits that he kind of had this theory all along that he had no plan. He didn't want to incriminate himself, quote, right off the bat. But then once he was arrested, there was no reason to hold back. And so is the post arrest. That was for him the turning point at which he felt that it was OK for him to spill the beans and give a full extent of his confession. And so I do think that it's fair to listen to the tapes and determine whether or delivered in a coercive manner. And I also would make the point that while some of the comments, again, the comments were determined to be coercive by the Supreme Court of Kentucky, and so we don't contest that. But we actually think the comments are close to those that were rendered in McAlvin, because under KRS 620.150, the Kentucky CPS actually has significant leeway once children have been removed from a home to withhold visitation from that from that parent. We again, it's not to say that the parent can never see them again because it is subject to review of the court. But CPS does have significant power to withhold visitation after something like this has been admitted to. And so I take it the I take it that not all coercive statements are Supreme Court says they're coercive, but I take it the degree of the coerciveness factors into whether they ultimately induced the incriminating statements. Right. I mean, when you're looking at the totality of the circumstances, I assume you're I look at whether I mean, did I have a gun to somebody's head or did I make certain statements? I mean, either. I mean, it it affects whether it affects the overall analysis, right? How coercive they were, even if they were coercive. Well, and I would just add to that that often you have a dynamic, which you see in this interrogation of there being a conscience. Get it off your chest. Right. There's a little bit of that going on. And of course, that swims in the same direction as the alleged coercion from the agents. And I find that very hard to sort out. But I guess it goes to point the more coercive the statements by the officers, the less you're going to worry about this, getting it off your chest point, the less coercive that is, it seems to me, the more relevant it is. The person also has an instinct to get this behind them, get help and move on. I agree that it would be proper for a court to consider the the level of coercion and that a statement might have. But Chief Judge Sutton, going back to your point and the first principle that I started with, because we're here under a totality of the circumstances test and because that test allows for considerations of so many factors in such a balancing under it, it's a heavy lift to show that no reasonable jurist would have reached struck the same balance as the Kentucky Supreme Court did here. And so you have a situation in which, yes, undoubtedly there are aspects of this these statements that were coercive. But I would submit, again, that the Supreme Court of Kentucky considered a lot of the factors that Mr. Michael points to. For example, they noted that the children had already been removed and they also noted Miss Newton's status as a social worker. And so I think to say that the Kentucky Supreme Court was unreasonable here in finding that, notwithstanding some of those coercive elements, that his confession was ultimately voluntary, I think it is fair to say that other reasonable jurors could strike that same balance. And that is what Mr. Michael must disprove to receive relief under ADPA. I guess at this point, if there are no further questions, I would ask that the district court's decision denying Mr. Michael's heaviest petition be affirmed. And thank you. Thank you, Mr. Kilgore. Mr. Higgins, you've got your rebuttal. Thank you, Your Honor. A couple of points. I'd say first it is to determine whether or not the child separation threats here caused Mr. Michael's confession. Certainly, the extent to the degree to which they were coercive is a factor. And here, again, the threats were kind of off the charts coercive. Michael's children were taken from him 11 days before this interrogation occurred. And he was threatened by a social worker in a police line. And says, of course, should look to. So when we look to see if the confession happened, the nature, the incredibly coercive, incredibly credible nature of those threats make the voluntariness that much more likely. The second thing I'd like to talk about is in response to Chief Judge. One thing about Lynam is she she testified that she how coercive the statements were and that she because I think she went to trial, right? So she there was a sworn statement that she said she wouldn't have confessed were it not for the the statements that we I take it. Mr. Michael has never had occasion to put in a sworn statement about that or has he? Yeah, correct, Your Honor. There is no kind of evidence in this record that right after the threat happened, Michael said, oh, OK, I'll I'll give that admission because I want to see my children or there's no affidavit he filed to that point. But I'd point this court to Arizona v. Fulminante where I mean, the facts of that case where there was a prison inmate who a separate inmate said, if you don't, if you confess to me, I'll protect you. And what the Arizona argued in that case was that at no time did the defendant indicate he was in fear of other inmates, nor did he actually seek the other inmates protection. So Arizona v. Fulminante kind of stands for this proposition that you don't need the sort of statement from the suspect that, yes, I am kind of giving into these coercive threats like I am responding to these threats. What you do is look to the inferences and whether or not the inferences that the Kentucky Supreme Court drew were reasonable. And here, of course, they weren't because Michael responded directly to the threats, the child separation threats, after denying those same accusations for the first ninety nine minutes. There was a lot of discussion about my friend on the other side's presentation about the sorts of things that Michael admitted to before the child separation threats. But again, after the threats, he admitted to far more damning misconduct. That was what broke open the sorts of admissions and the sorts of confessions that gave rise to a sodomy charge. And if I may, I'll just conclude with Miranda with the Supreme Court case that really does look at the intersection between coercive police tactics and the Miranda rights. And that's Illinois v. Brown. There, you had an illegal arrest, which the Supreme Court found to be exceptionally coercive. Two hours later, the defendant was taken to a police station given his Miranda rights and then made a confession. And what the Supreme Court said was that there was no mitigating circumstance whatsoever to kind of wash away the taint of that initial illegal arrest. And that included the Miranda warning. So Illinois v. Brown absolutely stands for the proposition that when extremely coercive tactics are deployed and a confession comes later, a Miranda warning is not sufficient to wash away the taint of the coercive tactic. I see my time is up. If there are no further questions, we ask that this court reverse and grant the petition. All right. Thank you very much, Mr. Higgins. Thank you, Mr. Kilgore. We really appreciate your arguments. I'm sorry we couldn't do this live last week. I guess it was maybe you, Mr. Higgins, that had the conflict, but I'm glad we were able to do this by Zoom. Mr. Higgins, I see you're court appointed and you did a terrific job with your brief and your argument. So Mr. Michael's lucky and so are we to have such great advocacy. So thanks very much. And thanks to both of you. Ms. Foltz, you can submit the case and adjourn court. The honorable court is now adjourned.